from y'all. And we will start with case number 25-10365, U.S. v. Nourian et al. And we'll start with Brent Newton for Rodberg. May it please the court. This morning I want to primarily address the issue of whether the Federal Employees' Compensation Act, or FECA, the scheme, and the Department of Labor's Office of Workers' Compensation Program's implementation of FECA qualify as a health care benefit program under 18 U.S.C. section 24B and the health care fraud statute, which adopts the definition. If I have any time left, I would like to address the issue of whether there's insufficient evidence that Appellant Rodberg was aware of the medically unnecessary nature of the compound prescriptions in this case. I'll first address the section 24B issue with a focus on the term plan. In interpreting the undefined term of a federal criminal statute, any statute for that matter, this court should first determine whether there is a plain meaning of the term, in particular, a plain meaning in the statute's particular context. Here, health care context. In deciding whether the meaning of the undefined word is plain, this court also must consider the overall statutory scheme, including any other related statutes which use the same or similar terms. If there's still not a clear meaning after that, the court should look at the legislative history to see if it can help resolve an ambiguity or unclear meaning. Finally, if the legislative history does not provide an answer, then this court must apply the well-established due process requirement to strictly construe statutes against the government and the related rule of lenity. Engaging in such an approach to the question of whether Section 24B's definition of health care benefit program includes the FECA workers' comp scheme, the answer is that it does not. But we, we, Andrew, I'm sure you're going to get there, but we said 24B is broadly defined, and then when I look at that Shaw decision, it looks like we've equated it to TRICARE and specifically described it as a health care program, health care benefit program. Shaw addressed the anti-kickback statute. Shaw did not address 24B. But it looped the FECA in with other health care benefit programs. 24B is distinct from the anti-kickback definition. The anti-kickback definition says medical benefit through insurance or otherwise. The same Congress that enacted anti-kickback statute's definition also enacted 24B on the same day and the same act. Even though they're in different provisions of the code, it was the same act. See, but so you're saying this is not insurance, this is workers' comp? Is that the same thing? FECA is not insurance. FECA is unquestionably workers' comp. This court has so held, many courts, the Supreme Court has so held. Workers' comp was created 100 years ago or so as a substitute for a negligence action against your employer. It is not health insurance. It's not a contract, clearly, because the Department of Labor has discretion whether to apply it. The only real question is the word plan. Anderson did not address whether a workers' comp scheme is within a plan. So first question, is it plain? No, it's not plain. The government wants to say, well, look at just the dictionary definition of plan. A plan can be in a myriad contexts. This is the health care fraud statute, meaning the word plan has to be read in the context of health care. If you were to ask an average person, what's your health care plan? We would pull out our Blue Cross Blue Shield card. Maybe an elderly person would pull out their Medicare or Medicaid card. Maybe a military person would pull out their TRICARE card. Those are insurance plans. Those are not workers' comp. A person's not going to say, oh, my God. Remind me just procedurally, this came up through a motion to dismiss as no. No. It came up in a motion for judgment of acquittal, arguing that the government failed to prove that FECA and alternatively the Department of Labor workers' compensation, although that was not pled in the indictment. I'm addressing the broader issue, assuming we're talking. Judgment of acquittal applicable to how many of the counts? Count one for Appellant Rydberg, although if I prevail in this count, then that requires a judgment of acquittal on the money laundering because the only specified unlawful activity for the money laundering was the Department of Labor claims, not the Blue Cross Blue Shield claims. I'm not arguing Blue Cross Blue Shield is not a health care benefit program. So if you agree with me that there's insufficient evidence of FECA as best constituting a plan, then the remedy is to vacate the conviction and send it back for a retrial on the Blue Cross Blue Shield. This is alternative theory, excuse me. The government's clearly not argued this is that you can sustain the verdict based on the Blue Cross Blue Shield. I alternatively argue that even if, assuming arguendo, that the workers' comp, FECA workers' comp scheme, Department of Labor offers workers' compensation, assuming that is, for the sake of argument only, a plan, then there's still insufficient evidence because there's insufficient evidence to prove Appellant Rydberg was aware of the medically unnecessary aspects. Government argues, well, there's proof that he did kickbacks. I disagree, but even assuming arguendo, there's proof he did kickbacks. As the 11th and 9th circuits have held, kickbacks are not sufficient to satisfy the health care fraud statute. But I want to return to my ‑‑ Before you return, Dr. Williams was highly incriminating of, broadly speaking, your client on the sufficiency point. Oh, kickbacks. He never once said anything about knowing Rydberg knew that there were medically unnecessary aspects. It's very important to distinguish between ‑‑ Well, but it says, you stated you participated in a pled guilty conspiracy to commit health care fraud. Did you commit that crime alone? No, sir. What are the names of the other evangels you committed the crime? Christopher Rydberg. He never once specifically talked about Rydberg's knowledge. I know, but the jury hears that testimony. They could choose to credit him whether it was specific or not. In your new trial motion, you tried to defeat Williams saying that testimony was false, but the court didn't accept that. So then you've got the jury able to credit Williams who explicitly states health care fraud. Well, Williams was no expert in whether kickbacks alone qualifies health care fraud. Medically unnecessary. There was no objection to him on that basis. That statement, incriminating, was just right out there for the jury. If the government calls a witness and that witness says, did you conspire with this person to commit a crime, and the witness says, I did, pass the witness, that's not insufficient. That's not sufficient evidence to prove very specific mens rea. Well, then you object and say this witness can't speak to his criminal state of mind, but there was no objection. Regardless of whether there's an objection, it's not sufficient evidence even coming in. But I'd like to return in my remaining time to the FICO issue. That's the most important issue in this case. It's not a plan. The plan's not defined. In the health care context, Cooper requires Cooper, this court's decision, and Cooper says you've got to look at it in the health care context. It's an anti-kickback statute, but it's the same thing for our purposes here. I should remember, in your time short, in your brief, do you cite any circuit that's agreed with you that cars out? This is an issue of first impression. This is an issue of first impression. But therefore, your contention is no circuit is ever actually upheld. The government cites Martinez, the Sixth Circuit. That was an anti- silent antecedent assumption. No one argued this in that case. They did not even mention 24B in the Sixth Circuit's opinion. But what do you do with Shaw, which specifically describes FICA as a, quote, federal health care program? That's the anti-kickback statute. That's a different statute. That defines it insurance or otherwise. 24B doesn't say insurance or otherwise. That's a critical indicator. At the very least, it creates an ambiguity. Legislative history doesn't answer it. Rules of statutory interpretation don't answer it. Well, it has ambiguity because we haven't construed it in your statutory context. How is that? No one's interpreted it. Well, that just makes it an issue of first impression. It doesn't make it ambiguous. Otherwise, we would have ambiguity all over our law. I'm not arguing that it's... Oh, the ambiguity is for the reasons I've stated in my briefs. A, people don't talk about health care plans and mean workers' comp. B... Why not? They just don't. Health care... For the reasons in my brief, you can look at the way the case law, you can do a Google search. People talk about health care plans as insurance. Well, we did. I grant you it's in a different statutory context. That's fine. I'm not sure that gets you all the way there. No, I think it actually gets me there because you have to look at Congress passed the anti-kickback definition and they passed 24B the same day in the same context. I think you're reading this out of context. There's nothing in the sentence, in this paragraph, indeed in the surrounding paragraphs that remotely tie that to the kickback statute. It's a generic... It's in the facts section. It's just generically saying this is a federal health care program. Federal health care program is the term out of the anti-kickback statute, not the term out of 24B. That's critically wrong. Even though it's in the facts section with no reference... All right, go ahead. Pull the indictment. It was not a health care fraud case. All right, I'll reserve it. Okay, you've saved time for rebuttal. Thank you. Okay, and now we'll hear from Ashley Kaper for Nourian. Good morning. May it please the court. With limited time, I'd like to preview that I intend to focus on my argument on the prejudice that occurred at sentencing. But first, I'd like to make a couple of quick points regarding the government's rebuttal at closing. The government's rebuttal at closing was improper and prejudicial, requiring reversal and remand. To refresh the court, the facts are that in rebuttal, the government presented three slides, the three monkey slide is what we refer to it as, see no evil, hear no evil, speak no and proceeded to argue that Nourian and Ryberg actually put their heads in the sand, closed their eyes to what was happening around them. This contravened with the court's refusal to permit the jury instruction of deliberate ignorance. You know, sort of the obvious response would be, it's isolated, and then you've got a jury instruction. Your Honor, that's... You may not have gotten as far as you wanted, but there was no objection to the one you did get. That's right. We did get a jury instruction, but the jury instruction only instructed the jurors to not take into account the slide and not the accompanying... I agree. And the statement accompanying it, but you could have said, Your Honor, we need a little more. That is right, Your Honor. Our position would be similar to Williams, where there was objection as to the jury instructions there, where it was the first version of the jury instruction that was objected to. The court held that any remedy that had occurred, that objection carried on, and we would say the same applied here. Judge Lindsey agreed that the government overstepped, and we would also argue that knowledge was quintessential to Nourian's defense, and so the prejudice here was enormous. I'd like to now move to my next point, which is my primary point, and that is that the court improperly factored in Nourian's perceived lack of remorse at sentencing. I know that this is a topic that the court is very familiar with on the heels of the Saldana-Rodriguez decision, and I think that this is very distinguishable. Here, the judge said specifically at sentencing that Dashid Nourian did not say he was sorry. He did not say he had learned his lesson. This is taking into account an improper factor when determining sentence. This was right on the heels of him issuing a sentence. But it was right after allocution, correct? Yes. Which was sort of meandering and not very remorseful. Your Honor, I would say- In other words, wouldn't it naturally be responsive to what he's saying at sentencing as opposed to commenting on his assertion of innocence? I would say that the court focused on what was not said rather than what was said. And so, yes, there was some meandering with respect to Nourian's allocution. But the court didn't focus on what Nourian said. It was instead the court said, quote, he did not say he was sorry. He did not say that he had learned his lesson. Is this a Fifth Amendment argument or it's evolving out of Mitchell? It is a Fifth Amendment argument. And what's the line? Because you're right. We see this all the time. District courts are allowed to comment on sort of the larger atmospherics of sentencing. Yes, Your Honor. So what would you say is the clear line? I would say that the line- Is it just using the word remorse? That's sort of forbidden? Yes. Well, I'd say turn to Laca, turn to Thomas. In their Laca, it was the court said there was no inclination of repentance. In Thomas, the judge wanted him to come clean. In both of those cases, the court clearly expressed that the factor that was being taken into consideration at sentencing was the defendant's failure to express that he had done something wrong. And that is very similar to what occurred here. So what is the bright line is Your Honor's question. And I don't think that there is a distinct bright line. It's what the court says at sentencing. And as Your Honor pointed out, in the Saldana-Rodriguez case, it was more of the defendants insisted on their innocence. It wasn't that they then, at sentencing, had failed to acknowledge wrongdoing. And I find that that is very distinguishable from the incident case. I'd also just like the court to take into account that even though there was a variance that was a lower, imposed a lower sentence than a guideline sentence, that as in Escalante-Reyes, which Your Honor is quite familiar with, that case was remanded for considering an improper factor, even though that, too, was below guideline sentence. So clearly, Judge Lindsey found that this was important, the defendant's lack of acceptance of wrongdoing, or else he wouldn't have brought it up. It came out of nowhere. We would also say that because of that, this was an issue that the district court raised to Escalante and resolved it. And so under Hernandez-Rodriguez, this would be the same standard as if an appellant had properly raised the issue. Before your time runs out, just on the whole array of sufficiency, Mr. Aguiar was very incriminating in terms of your client. Yes, Your Honor. We are aware that with respect to the prescription pad and the sufficiency of the evidence there that Mr. Aguiar did incriminate Mr. Norian. That said, he then went on to say, Mr. Aguiar did, that he was not paid by Mr. Norian, that there were instances where the prescriptions were not completed by Mr. Norian. And so while a pad may have been provided to him, there was still a lot of outstanding question as to how much Mr. Norian actually knew about the crimes that were being committed. Okay. Thank you. You've saved a tad of time for rebuttal. We will now hear from the U.S. via Javier Sinha. Good morning, Your Honor. May I please the Court? This is Javier Sinha on behalf of the United States. I'd like to take the issues and the order of defendants raised them, so the FICA issue, the Three Monkeys issue, and the sentencing issue, but happy to move around if the Court has any. Well, just procedurally, were there more than one mistrial in this case? More than one. I apologize. Mistrials. No. There was at least one mistrial, correct? James Norian was, his case was separated in this trial because of health issues. And he hasn't gone to trial yet? No. He was deemed competent recently, and so we will be taking him to trial soon, but he's not going to trial yet. And Dr. Tava, in this trial, his appeal has not been consolidated? I think that's right. Yes, Your Honor. So the only issues here are Reitberg and Norian. Turning to the FICA issue, Section 24B says plan, and includes no limitation on what kinds of plans. The defense counsel kept saying, you know, the meaning of health care plans. That's not what the statute actually says. It just says a plan or a contract. So the question is, what is a plan? And there's no reason to think Congress meant to limit it in any way. Indeed, Congress put the word any before plan, and any seems to suggest, without limitation of any kind, any sort of plan. And so FICA falls under that kind of broad statutory language, which this Court has recognized as broad and Anderson. Also note, to the extent that defendants are arguing that we should have listed in the indictment something like they defrauded the plan created by FICA, that most would be a non-fatal variance, and this Court can confirm on those grounds. Notice that this is an issue of first impression? It is correct, Your Honor. I don't think any court has been presented with the claim that FICA is not a health care benefit program. I think possibly because the statute is so clear that any plan qualifies. But you're not aware of any government prosecution that's seen through conviction and affirmance? There's no circuit that's affirmed a conviction based on? I do think there have been a lot of cases where we charge violations of the health care fraud statute, alleging that FICA is a health care benefit program. I don't think there's been challenge on appeal that FICA is the incorrect, either the incorrect words used in the indictment. Right, but I guess you might find things, I don't mean to press this point too much, but you might then find cases like Shaw, where just even the statement in the background it encompasses FICA fraud. I think there's a few that mention it sort of in the back section, or they associate FICA with things like Medicare or Tricare, or even sometimes insurance plans. I think we cite a first circuit case that says FICA is insurance-like or something like that. But no court has said under Section 24B FICA qualifies as a plan. But I think the plain language of the statute shows it does. Congress could not have written it more broadly by saying any plan here. If there are no further questions on that, I'm happy to move on to the three monkeys issue. The first point is that this should be reviewed for plain error. Defendants objected. The court sustained their objection, and they got a curative instruction. This court has said that once that happens, if the defense wants to continue to complain about the error, they have to object again. Defendants here didn't do that. I mean, obviously, rebuttal closing, there's no chance for them to respond. It's very difficult to object and draw attention to something. Sort of devastating to have a slide up there. So even if we were to accept that it's plain error, which I'm not inclined to agree with, I just would love to know you're acknowledging it was error. I don't think we do, Your Honor. I think, OK, so the district court, when it rejects the deliberate ignorance instruction, says there's no evidence for it. And then the prosecutor, right after talking about, oh, are they really claiming that they're two islands of purity in front of a sea, in the sea of corruption, says, you know, it occurred to me, I've got a slide ready. How could he present a slide if there's no evidence to support a slide? So the slide was to characterize not the evidence or our arguments, to characterize the defense's argument. It had just happened at closing? Correct. So the government is responding in the instant to a defense closing, but he happened to have a slide all ready to put up? I think, my understanding, and I have to make sure, I think this happened the next day or later, and so they had time to, I think overnight probably, prepare the slide. So this was in response to the defense's closing. And I can read the quote. Both defendants' closings? Correct. As we say in our brief, both defendants argued in their closing that they had no knowledge. And I'll read the court very quickly just some of the things that we said before putting the slide on. Right, but I'm just sticking with it. It's just a government rebuttal argument putting a slide up based on a defense that the district court has said there's no evidence to support. At minimum, you'd go to sidebar. So that's what happened here, actually. The government went and said, I intend to put this up. Oh, no, you're right. That's what I mean. I think here the government thought, and I can still believe, that the slide was not characterizing a theory of liability that wasn't presented to the jury. It was characterizing a defense that the jury had just heard that these defendants didn't know anything, that they had no idea what was happening. But then the logic is, I may have a ruling that disallows it, but they've opened the door. I don't think we thought this was disallowed, because I don't think we believe that this was somehow telling the jury, you can find them guilty through deliberate ignorance. Our argument has always been that they had knowledge. And we actually said, look at this slide. This is unbelievable. Defendants are arguing that they had no idea. That just can't be believed. And so the slide wasn't saying the jury should believe what the slide showed. It's saying what the slide shows can't be believed. The evidence is so clear they had knowledge. So it's a willful blindness. It sounds like don't see, don't say, don't hear. I can't think of anything more on point with a willful blindness, deliberate and big. It wasn't the comment about Chris stepping out of meetings. It wasn't that the comment that in the little exchange, once the objection is drawn, the government says this is because Chris used to step out of the meetings exactly when incriminating things were said. That's okay. So he stepped out so he could deliberately say he was ignorant. It's possible. I think that may have been a misstatement. It may have been referring to when Chris stayed in the meetings with Dr. Williams. But it's not clear from the record what the government was referring to there. But I do think the government said that. I'm just not sure what exactly they meant. But I think the government here is trying to say they're arguing this was somehow they didn't know. And we said this is not believable. But even if the court wants to not talk about that issue, I think on the substantial rights issue, it's quite clear this did not affect the substantial rights. They received the jury instruction. It may not have been what they wanted, but it was quite clear. And the district court... And this substantial rights argument would apply even if we said it was preserved? Correct. Then you would just say it's harmless because... Correct. It's isolated and the usual litany. Correct. If it's preserved as a group for abuse of discretion, if it's not, it's a group for plain error, clear or obvious error. There's no clear or obvious error here. And there's no abuse of discretion here either. This occurred, as the district court said, it's two passing references and otherwise a 45-minute long argument. It wasn't mentioned again. The court gave a curative instruction. The court's instructions made it clear the jury had to find knowledge to find guilt here. And so there's no effect to their substantial rights. I'm happy to move on if the court has no more questions on this point. The jury, they had some questions, didn't they? They had a few notes. About impeachment and about uncharged defendants? That's correct, Your Honor. But none of them had to do, I think, about anything here.  Nothing about Sienta? No, I don't think so, Your Honor. If there are no more questions on this, I'm happy to move on to the last point, which is the lack of remorse point. This court has repeatedly said that the district courts may consider lack of remorse sentencing. Indeed, district courts have to do that under 355 pre-A, which requires them to consider things like a defendant's history and characteristics and deterring the defendant's future crimes. The one thing a district court can't do is consider a defendant's invocation of the right to remain silent or the right against self-incrimination. The court didn't do that here because Norian waived that right by first, filing a letter with the court. And in that letter, he does discuss his remorse. And second, by allocuting a sentencing. So I think there might be cases where the waiver, the scope of the waiver is unclear. I think in this case, it's quite clear that it includes remorse or lack thereof because Norian himself mentioned it in his letter to the court. If you had to pick out one statement in this allocution that most sort of rejected any sense of obligation to victims, what would it be? I think it's the only site in our brief, Your Honor, where he says, I want to get it right exactly, he says, I've tried to do whatever I can to prove that maybe I'm not part of this, but unfortunately, we saw the jury. But again, I don't want to read this letter because it's under seal, but it's on page 10,660 if the court's curious. There, Norian does discuss his remorse. And he references that letter in his allocation. Toward the end of it, he goes, I wrote a letter to the court, the court can go check that out. And so I think, regardless of the scope of the waiver, it certainly does include remorse here or lack thereof. Okay, what's the site again? It's 10,660. 10,660. Because the quote you gave from the allocution really has to do with the jury's decision. That's getting a little closer to lockup. I think it's closer to the line. We cite to this letter on page 111 of our brief.  Maybe we should have made it more clear about the letter itself, but I think the question here might just be what the scope of the waiver is. And I think it's also a little confusing because defendants try to say they maintain their, this is a statement about maintaining his innocence. It's not really what he says. He doesn't really say, I am innocent the way some defendants do in other cases. And so it's not clear that this is a case like lockup or like Thomas where defendants just go, I'm innocent. Or in the case of lockup, possibly don't say anything at all. And so by speaking, by writing this letter, Norian has waived his Fifth Amendment rights to remain silent. The court could consider that considering his lack of remorse. The second point I'll make on this, Your Honors, is that Norian has to prove that if the court considers his lack of remorse improperly by considering his Fifth Amendment rights, it had to affect the sentence. There's no evidence that the court did that here. In other cases like Mitchell, the court says I've held it against you that you didn't confess. Or in lockup, the court says, I've sentenced you I won't reconsider it because you haven't confessed. That's not what's happened here. The court mentioned Norian's statement, lack of remorse, went on and sentenced him. It didn't say because of your silence, because of your Fifth Amendment right, because you didn't confess, I'm going to sentence you to a higher sentence. The last thing I'll note here is that this too is viewed for plain error. Norian did not object after the court made these statements. He argues Hulking-Hernandez somehow preserves this, but that only preserves a claim that your sentence is too high. It doesn't preserve a claim that somehow the court violated your Fifth Amendment right. And the last thing I'll note is that they argued briefly in their reply briefing in this court this morning that the court made a point to raise this issue on its own and decide it. The court never decided the Fifth Amendment issue. The court never expressly said, there's an issue here about the waiver of the Fifth Amendment right, I'm going to decide that in the government's favor or against the defendant. The court just made this statement and moved on. If there are no more questions, Your Honor, I'm happy to. One, just quickly, Pinkerton's always difficult. As to the money laundering accounts where they weren't Norian's own accounts, how does Pinkerton work there? Pinkerton works because Norian would be guilty for the substantive crimes of any co-conspirator as long as they were within the scope of the conspiracy and reasonably foreseeable to him. And so because the substantive accounts were all the object of the conspiracy, Norian would know that those accounts were reasonably foreseeable and they would be within the scope of the conspiracy. Okay, you're done. Do you all, do either of you all have any questions? Okay. Thank you very much, Your Honors. All right. We'll hear from Newton again with a brief rebuttal. Thank you. The Supreme Court has said so many times in applying the plain language or the plain meaning rule, you must consider context. You don't just pick the dictionary out and look at the term out of context. We have to remember this is the health care fraud statute and the Section 24B is defined health care benefit program. In Cooper, this Court's decision in Cooper, which I cite in my briefs, it was interpreting the anti-kickback statute, but it was talking about a term in that statute that the Court said you've got to look at it not in the dictionary definition but in the technical medical health care definition. Similarly, the word plan, you can't ignore the context. That itself supports the argument that the ordinary meaning in that context is insurance, but it is bolstered by a completely independent argument, which is and this is where the Shaw case actually helps me, doesn't hurt me, or at least the statute at issue in Shaw. Federal health care, federal health benefit, however, whatever the term is in the anti-kickback, it superficially looks like the same definition in 24B, but it's different because it says insurance or otherwise. That's missing from 24B. The Supreme Court's also said when you look at one statute, you... Why is or otherwise broader than any? Any is a... Thank you for mentioning that. I cite in my reply brief three or four U.S. Supreme Court cases that say any cannot be used to transform the meaning of a statute. Expansive, yes. Transformative, no, is what they say. So otherwise is transformative and any is not? Yes. I cite cases that say otherwise is incredibly broad. I cite cases that say any must be looked at with respect to the object of the word any, and the object is plan. So if a health care benefit, I'm sorry, if a workers comp scheme is not a health care plan, or if a workers compensation scheme is not a health care plan, then putting the word any in front of plan is utterly irrelevant. Sure. Any kind of health care, of health insurance. So for instance, in Anderson, it was Blue Cross Blue Shield not directly serving as the underwriter or the insurer. They had a contract with a self-insured employer. And this court said, well, that's enough to qualify under the section 24B definition because there's a contract where health insurance is provided. You incorporated the government's sentencing argument as to your client, the monkey emoji? Oh, yeah, yes, yes. But you heard there was a little bit, when the government stood up, there was a different specific answer. Do you agree or not agree that that was responsive to your closing argument? I think in a case like this, you have to look at the evidence in a light most favorable to the appellant here who is alleging an error in harm. And so the government has a burden to show that wasn't referring to my client. If there's any ambiguity. Right. But a lot of the evidence was affirmative. It wasn't hiding. It was that he wrote false lines on the checks that he wrote. He wrote false descriptions for one of the cashier's checks. That's correct. So that's affirmative. That's not really the prosecution theory there is he's fully, integrally involved with the family. He's not denying knowledge and hiding. Not about health care fraud. Okay. This is back to your FECA argument. Well, no, no. This is distinct from that. So there's two arguments I have about count one. One is turning on FECA. That would just get me a new trial on the Blue Cross Blue Shield. The other one is there was insufficient evidence. Mr. Rydberg knew of the medically unnecessary nature. I'm not disputing the kickbacks for this purpose of insufficient evidence. Kickbacks don't give you sufficient evidence. You've got to have proof he did not know there was medically unnecessary. Proof he knew there was medically unnecessary prescriptions. And that's what the monkey thing is harmful to him. Okay. I'm out of time. Okay. Yes. Thank you. Thank you. And we'll now hear from  I'd like to first address the three monkeys slide once again. Judge Lindsay found the error. There was a bench bar conference. He determined that the government had overstepped. He then said that he was going to give a corrective instruction to the jurors. And while he did, it wasn't a complete corrective instruction. And so our argument here is that this allowed the jurors to find a lower mens rea when determining that there was guilt. And while the government may argue that this was a brief snippet of the government's closing and that it, I'd like to first acknowledge, as Your Honor did so, this wasn't rebuttal. And that is impactful. The timing is important. Secondly, we're here today before the court for 40 minutes. If in one minute I do something outlandish, it is going to be something that you remember. So you're saying it was preserved and therefore we're just asking about prejudice. Yes. The curative instruction wasn't sufficient and you preserved that too. But again, sort of a version of the Ryberg question. A lot of the evidence the government had in this case was affirmative guilt, like bringing the pads that had patients' names directly to Aguiar. I would say that a lot of the government's evidence was circumstantial. Much of it pointed to James Norian's guilt and specific evidence of his knowledge and mastermind. That's true. Norian was the kingpin. True. But was there theory ever really that your client was making himself willfully blind? I believe so. I believe so in the sense that there wasn't a significant amount of evidence showing that Mr. Norian knew who the doctors were, what the arrangements were with the doctors, what the payment arrangements were that were occurring. He had no involvement with the money orders. James was the one fully involved in the kickback side. That's correct, Your Honor. And so I'd like to just briefly address the sentencing once more as my time is running close to ending. Please look closely at that letter when you do. I actually think, if I may complete my thought. Finish the sentence. I was present at sentencing and I am familiar with that letter and I do not believe that it indicates that Mr. Norian waived his Fifth Amendment right. Okay. Thank you, both sides. We appreciate your arguments and we will now decide this case.